at the outset, that we in no way pass upon plaintiff's claim to damages, full or partial, for this breach. This reservation includes the question, among others, whether the Government's termination of the contract in January 1971 would have been valid under the termination provision if the contract had remained in effect. All those issues relating to damages are not before us and we leave them entirely open, without intimating any opinion or tendency. Whether plaintiff's present victory will be real or Pyrrhic still remains to be litigated.

The plaintiff's motion for summary judgment is granted and the defendant's is denied. The amount of recovery, if any, will be determined in further proceedings under Rule 131(c).

**ALBANO CLEANERS, INC.**

v.

**The UNITED STATES.**

No. 188–67.

United States Court of Claims.

Feb. 18, 1972.

Frederick T. Stant, Jr., Norfolk, Va., attorney of record, for plaintiff.

Gerald L. Schrader, Washington D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 7, 1971. No exceptions to or brief on this opinion and report have been filed by the parties and the times for so filing pursuant to the rules of the court have expired. On December 23, 1971, plaintiff filed a motion for judgment pursuant to Rule 141(b) requesting that the court adopt the commissioner's findings of fact, opinion and recommendation for conclusion of law and enter judgment accordingly. Defendant has filed no response to this motion, the time for so responding has expired and the case has been submitted to the court without oral argument.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby, granting plaintiff's motion, adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

GAMER, Commissioner:

This is another case in which the Government, shortly after awarding a contract, terminated it on the ground that the award had been improper. The plaintiff contractor contends the Government's action constituted a breach of contract, for which it seeks recovery of the expenditures it made to perform the contract and of its anticipated profits. The contract was to be in effect for one year but was ended after less than one month.

On September 8, 1966, the Naval Supply Center at Norfolk, Virginia, invited bids for the furnishing of laundry, drycleaning, waterproofing, and repair services on various designated garments and other items. The services and items were set forth in four "Lots," with bidders to indicate a unit price for each item in the lot upon which they submitted a bid. Five "Zones" were designated, consisting of specified areas in and around Norfolk (where several naval installations are located), the unit price for each item to be set forth for each zone. Plaintiff, which had held similar contracts in previous years, submitted a bid on two of the lots—Lots III and IV. On the basis of the overall unit prices, plaintiff was the second lowest bidder on Lot IV, which pertained to garments referred to as "foul weather gear."

The Supply Center decided, however, that, with respect to Lot IV, in would not award the contract to the bidder, Compeco Cleaners, whose unit prices were, on an overall basis, the lowest. This decision was based upon the fact that Compeco had inserted a qualification in its bid to the effect that minimum order charges would apply—$6 per order if the items were transported by Government vehicles, and $15 per order if the items were picked up and delivered by the contractor. Accordingly, a contract with respect to Lot IV was awarded to plaintiff, the contract term being for one year, commencing October 1, 1966.

Thereupo, Compeco protested its failure to receive the award. It pointed out that a similar minimum charge provision had been included in a contract it then currently held with the Center, as well as in seven contracts it had had during the past eight years, and that the provision had not theretofore been considered disqualifying.

Plaintiff had also inserted a qualification in its bid. This qualification was that "[d]elivery services will not be offered on orders totaling less than $50." Following consideration of Compeco's protest, defendant decided to terminate its contract relationship with plaintiff. On October 28, 1966, after plaintiff had been performing the contract since October 1, 1966, the Center notified plaintiff by letter that its contract "is hereby withdrawn because bid submitted in response" to the invitation "was improper inasmuch as the invitation did not provide for 'minimum order' charges." During the brief period the contract had been in effect, defendant had ordered and paid for services totaling over $1,000.

Plaintiff protested the termination by conferences and correspondence, during the course of which (a) defendant contended that the qualification plaintiff had inserted made its bid nonresponsive, that the award to plaintiff was therefore improper, and that the award had been made as a result of administrative error (it had allegedly failed to notice the qualification); and (b) plaintiff denied that its qualification established any "minimum order" charge as stated in defendant's letter and asserted that defendant's standard practice in prior years was to accept bids containing a qualification of the kind in question. Failing to obtain reinstatement of its contract, this suit followed.[1]

---

1. By order of February 28, 1969, the court denied defendant's motion for summary judgment without prejudice and remanded the case to the trial commissioner for trial.

■ Defendant here reiterates that the qualification plaintiff inserted served to make its bid nonresponsive and disqualifying, that the award of the contract to plaintiff was therefore improper, making the contract void *ab initio*, and that the withdrawal of the contract was consequently justified. It is true that in an appropriate case defendant may disclaim a contract on the ground of voidness *ab initio* because of the nonresponsiveness of the bid. Where a public contract is to be let pursuant to formal advertising, the strictures upon defendant's contracting agent are such "that the contract awarded must be the contract advertised and \* \* \* if it is not, the Government is not bound, since defendant's contracting agent could not bind the Government beyond his actual authority." Prestex Inc. v. United States, 320 F.2d 367, 371, 162 Ct.Cl. 620, 625 (1963).

■ It is plain, however, that this is not such a case, Every bid deviation from an advertised proposal does not automatically compel rejection. Contracting officers may waive deviations "provided they do not go to the substance of the bid or work an injustice to other bidders. A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered." Prestex Inc. v. United States, *supra*, 320 F.2d at 372, 162 Ct.Cl. at 627. Thus, "[t]he pertinent question \* \* \* is whether plaintiff's [bid] represented a substantial deviation." *Id.* Defendant, of course, argues that the qualification plaintiff inserted in its bid constituted such a substantial deviation, whereas plaintiff asserts otherwise.

Whether a qualification such as plaintiff inserted in its bid was substantial or insubstantial cannot be determined in a vacuum. The judgment must be made against the factual background of the particular procurement involved, and this can best be made by those familiar with and expert in the specific problems incident to the procurement. There is nothing on the face of the qualification that would compel one who is unfamiliar with the complexities of the industry or the problems relating to the particular areas involved to conclude, considering the size of the contract and the amount of orders that could reasonably be expected to be placed thereunder from the various geographical zones, that the qualification was a substantial one, nor is there anything in the evidence that leads to such a conclusion. Indeed, the evidence points the other way. For years, it was the judgment of knowledgeable officials in charge of such procurement that similar qualifications were not of such substantiality as to necessitate bid rejection, nor was it originally thought so on this particular procurement. Apparently what had theretofore consistently been considered, in contracts calling for services of the type here involved, as insubstantial in the setting of the naval installations located in the Norfolk area, was suddenly, upon the protest of a competitor, determined to be substantial.

■ The proper approach in a case "testing the enforceability of an award made by the Government, where a problem of the \* \* \* responsiveness of the accepted bid arises after the award" is that "the court should ordinarily impose the binding stamp of nullity only when the illegality is plain." John Reiner & Co. v. United States, 325 F.2d 438, 440, 163 Ct.Cl. 381, 386 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). There, the court pointed out that "[a]ny other course could place the contractor in an unfortunate dilemma" because of the liabilities to which he would be exposed if he refused to accept the contract by reason "of his own doubts as to possible illegality \* \* \*." *Id.* If the contractor in such a situation decides to commence "performance of the contract, a subsequent holding of non-enforceability would lead to denial of all recovery under the agreement even though the issue of legality is very close; and under the doctrine of quantum meruit there would be no reimbursement for expenses incurred in good faith but only for any tangible benefits actually received by the

defendant." 325 F.2d at 440, 163 Ct.Cl. at 387.

It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts and to uphold the award unless its invalidity is clear. [*Id.*]

In "applying that norm" and refusing to consider the "award to have been a nullity," the court in *Reiner* too looked to the "other occasions" wherein the contractor had answered "the same type of invitation" and "had been granted the contracts," such method of purchasing having become "an accepted form of procurement by" the agency there involved. 325 F.2d at 440–441, 163 Ct.Cl. at 387. Similar instances in which the court, following the *Reiner* approach, has refused to invalidate an award are Mid-West Construction, Ltd. v. United States, 387 F.2d 957, 181 Ct.Cl. 774 (1967); Warren Brothers Roads Co. v. United States, 355 F.2d 612, 173 Ct.Cl. 714 (1965); Coastal Cargo Co. v. United States, 351 F.2d 1004, 173 Ct.Cl. 259 (1965); and Brown & Son Electric Co. v. United States, 325 F.2d 446, 163 Ct.Cl. 465 (1963).

█ This is not to say that the Supply Center would be forever estopped from ceasing to grant contracts containing such a qualification if it decided to do so as a matter of judgment and policy, and as it apparently did with respect to another kind of qualification which Compeco had employed. But this is entirely different from awarding a contract with such a qualification, as it had done for many years, and then asking a court to declare its award action a nullity on the ground of its own alleged illegality. While the erroneous use of an illegal procedure in similar procurements is immaterial where the practice is plainly forbidden by statute or regulation, Schoenbrod v. United States, 410 F.2d 400, 187 Ct.Cl. 627 (1969), such an established practice is, as shown by *Reiner*, relevant, in cases not involving plain illegality, in considering the question of bid responsiveness and agency reasonableness in treating a qualification as insubstantial.

█ Defendant argues further that, because the contracting officer, in making the award, did not personally know of the qualification (the officer so testified), there was no meeting of the minds and that no valid contract was, therefore, ever formed. The contracting officer had not personally read in its entirety the Invitation for Bids, upon which plaintiff's bid was submitted and which included the qualification it had inserted on page 14. This contention has no merit. A unilateral mistake, even assuming there was one here,[2] does not serve to relieve a party of his contractual obligations. Allied Contractors, Inc. v. United States, 310 F.2d 945, 159 Ct.Cl. 548 (1962). "Any other rule would throw chaos into all contract arrangements because a party could avoid responsibility thereunder at his convenience simply by saying that he had signed the contract without reading it." Schoeffel v. United States, 193 Ct.Cl. 923, 935 (1971). There is no showing that the officials to whom had been delegated the responsibility of the opening of the bids, of examining and comparing them, and of recommending the bidder who should receive the award, did not know of the qualification, nor is there any valid showing that plaintiff did anything improper (as defendent intimates) by inserting the qualification in the particular place in its bid submission that it did, *i. e.*, in the portion relating to deliveries, rather than in the section in which the unit prices were inserted. Furthermore, the inference that the contracting officer would not have executed the award to plaintiff had he known of the qualification is not justified. Although what the contracting officer would have done had he personally known of the qualification at the time he executed the

---

2. The bids and recommendation by the pertinent officials concerning who should be awarded the contract were reviewed by a Board of Review, of which the contracting officer was a member.

award is, of course, speculative, there is every reason to believe that, upon being informed by those responsible for evaluating the bids concerning their recommendation as to who the successful bidder should be and as to what the past practice had been, he too would have executed the award anyway, as had the contracting officers in the past.

■ Defendant also defends upon the basis of the "Indefinite Quantities" section of the contract. Under this provision, defendant's contractual obligation to plaintiff was to "order supplies hereunder having an aggregate value at the unit prices specified herein of not less than $10.00." Defendant says that the amount of cleaning and repair service of foul weather gear that would be required could not be known in advance, and that, since the Supply Center actually did order more than $10 worth of services, it has satisfied its obligations under the contract.

This contention too is unacceptable. The controversy here is not based upon a failure to supply a specified amount of business during the contract term. The quantity of services was, to be sure, only estimated, to be paid for at unit prices for whatever amount of orders defendant placed (the estimated amount of the contract being $61,774.44). The controversy is, instead, about terminating a one-year's contract after less than a month. Over the contract term plaintiff did not have a right to any specific amount of business (the amount in part depending on the needs of incoming vessels), but it did have a right to receive whatever business of the type covered by the contract was generated in the specified contract areas ("Zones") for the full one-year contract period. Defendant could not, after ordering $10 worth of services, thereupon further disregard the contract and order the identical services elsewhere. If defendant decided, in its best interests, to terminate the contract, the contract afforded

a proper method of so doing, since it contained the standard "Termination For Convenience" provisions. However, a termination under these provisions requires, in fairness to the contractor, compensating him in accordance with a specified formula. The contractor is at least entitled to recover the expenses he incurred in preparing to fulfill his contractual obligations. An attempted termination under the indefinite quantities clause after ordering the minimum services there specified and without any further responsibility would plainly conflict with the obligations imposed by the termination-for-convenience provisions. Whatever the permissible scope of such an indefinite quantities provision is (see, e. g., The Tennessee Soap Co. v. United States, 126 F.Supp. 439, 130 Ct.Cl. 154 (1954)), such an unusual and unfair interpretation of the clause here involved as defendant proposes could hardly have been in accord with "the rational intention of the parties" when they entered into this contract, Ozark Dam Constructors v. United States, 127 F.Supp. 187, 191, 130 Ct.Cl. 354, 360 (1955), and the court would not be justified in adopting it.

■ Defendant additionally contends that, if it is held liable, the amount of plaintiff's recovery should be determined in accordance with the termination-for-convenience provisions rather than measured by the damage principles relating to breach of contract. In this respect defendant is correct. It seems clear that, in view of the protest, and the policy or other problems it raised, plaintiff's contract could, within the permissible discretion of the contracting officer, properly have been terminated under the termination-for-convenience provisions. G. C. Casebolt Co. v. United States, 421 F.2d 710, 712–713, 190 Ct.Cl. 783, 787 (1970).[3] As the court there held, in such a situation:

The rule we have followed is that, where the contract embodies a con-

---

3. "There can be no doubt that the Government, in the circumstances here, could have immediately terminated plaintiff's contract for convenience * * *. * * *

venience-termination provision * *, a Government directive to end performance of the work will not be considered a breach but rather a convenience termination—if it could lawfully come under that clause— even though the contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that he can terminate the work, on some other ground.[4]

[421 F.2d at 712, 190 Ct.Cl. at 786]

Accordingly, plaintiff's recovery is to be determined in accordance with the formula specified in the termination-for-convenience article, which precludes compensation for loss of prospective profits. Brown & Son Electric Co. v. United States, *supra*; Nesbitt v. United States, 345 F.2d 583, 586, 170 Ct.Cl. 666, 671 (1965), cert. denied, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); G. C. Casebolt Co. v. United States, *supra.*

■■■ Lastly, defendant, relying on Schlesinger v. United States, 390 F.2d 702, 182 Ct.Cl. 571 (1968), urges that, in the event the court allows recovery on the theory that a valid contract existed and in accordance with the termination-for-convenience article of the contract, the proceedings here should be suspended and plaintiff required to seek the administrative remedies available under such article. *Schlesinger* is not in point on this procedural issue. There, a termination was effected under a contract "Default" clause, a decision having been made by the contracting officer under the contract "Disputes" clause that plaintiff was in default. The contracting officer's decision was appealed to the Armed Services Board of Contract Appeals, which upheld the default termination. This court held, however, that, upon the facts found by the Board, and under the circumstances there involved, the termination should be considered as one for the convenience of the Government, and, concluding that "the determination of the award must be made, if the parties cannot agree, by the ASBCA in further proceedings before it," suspended further action in this court "to allow the parties to return to the Armed Services Board of Contract Appeals for a determination of the amount, if any, to which plaintiff would have been entitled if his contract had been terminated pursuant to the convenience-termination article." 390 F.2d at 710, 182 Ct.Cl. at 585. Such a procedure is analogous to that involved in proceedings under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964), in which the decision of an agency contract appeals board is being reviewed and it is held that further board proceedings are necessary. *See, e. g.*, J. A. Jones Construction Co. v. United States, 390 F.2d 886, 893–894, 182 Ct.Cl. 615, 628 (1968).

In the instant case, however, there was no dispute between the parties concerning any alleged default by plaintiff in contract performance, or any actual termination for such a purported default under any contract default clause. Nor

[T]he Hanson protest caused serious uneasiness among the Government's procurement officials; in fact, the local Army legal advisers concluded that Hanson had 'a meritorious position and that he was probably right and we were wrong.' In this situation, it could clearly be deemed 'in the best interest of the Government' (the standard for a convenience-termination) to terminate plaintiff's contract at once, so as to deflate the existing controversy with Hanson and to avoid a possible rebuke by the General Accounting Office if Hanson took its protest there. The case is thus quite comparable to our prior rulings that it can be considered in the Government's 'best interest' to use the convenience-termination clause to avoid a conflict with the Comptroller General * * * or a dispute with Congress * * *."

4. Citing John Reiner & Co. v. United States, *supra*; Brown & Son Electric Co. v. United States, *supra*; Nesbitt v. United States, 345 F.2d 583, 170 Ct.Cl. 666 (1965), cert. denied, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); Coastal Cargo Co. v. United States, *supra*; Warren Brothers Roads Co. v. United States, *supra*; and Schlesinger v. United States, 390 F.2d 702, 182 Ct.Cl. 571 (1968).

were there any appeal proceedings before any agency appeals board under the contract Disputes clause, there having been no contracting officer's decision under such clause for the contractor to appeal. Defendant does not contend that any contract provision obligated plaintiff to appeal the contracting officer's notification that its contract was "withdrawn" because the original award to it which defendant had made "was improper." In such a case, as was held in Brown & Son Electric Co. v. United States, *supra*, 325 F.2d at 450, 163 Ct.Cl. at 472–473:

> * * * It might be argued that this determination [the amount of the recovery] should first be made within the Defense Department by the contracting officer and the Board of Contract Appeals. We do not follow that course, however. This is not a case in which the contract was actually terminated (or sought to be terminated) under the termination article. It is a case in which the agreement was cancelled for other reasons, now found to be wrong * * *. In such a case, there is no requirement of the contract or the Wunderlich Act, 41 U.S.C. §§ 321–322, that the damages be computed administratively; the termination article is invoked only as the limiting measure of recovery not as its source. The case comes to the court without any prior proceedings before the agency tribunals. * * * A trial commissioner can take the necessary evidence and make the initial determination, following as nearly as he can the criteria of the termination article. * * *

To the same effect are Coastal Cargo Co. v. United States, *supra*, 351 F.2d at 1008, 173 Ct.Cl. at 264–265, and Warren Brothers Roads Co. v. United States, *supra*, 355 F.2d at 616, 173 Ct.Cl. at 723.

Based upon the foregoing, plaintiff is entitled to recover an amount to be calculated in accordance with the Termination For Convenience article, such amount to be determined in proceedings pursuant to Rule 131(c).

59 CCPA

**Application of CHICAGO RAWHIDE MANUFACTURING CO.**

**Patent Appeal No. 8658.**

United States Court of Customs and Patent Appeals.

March 2, 1972.

Rehearing Denied April 27, 1972.

Griest, Lockwood, Greenawalt, & Dewey, attorneys of record, for appellant;